Morning, ladies and gentlemen. Our first case for argument is Estate of Perry v. Wenzel. Mr. Barnes. Thank you, Your Honor. May it please the Court, I am Attorney Robert Barnes on behalf of the Estate of Perry, the appellant in this case. The precariousness of the precedent set by the District Court is evident in the briefings that the defendants themselves submitted to this Court. Aside from the District Court's error in substituting its judgment for the juror in contravention of summary judgment standards that are informed by the Seventh Amendment to the U.S. Constitution, the more precarious components of this District Court precedent are expressed by the City when it says in its brief that it believes someone in their care and custody does not require any degree of medical attention unless that person has either A. lost consciousness or B. is bleeding profusely. That has never been the standard. If that is the standard, then a person is put at risk the moment any arrestee is placed into the care or custody of a city or county or state in the country. The county has an equally precarious decision in its attempt to make the District Court decision the precedent of this Court, which is that as long as they don't declare a person in their custody, then magically that person is no longer in their custody, even if that individual is sitting without the freedom to leave in their booking room with a nurse and a correctional officer standing beside them. No court has ever upheld that as precedent either, and it would create a dangerous loophole whereby an arrestee could be placed into a permanent purgatory where he's never in anybody's custody and nobody has any obligation to care for him even when he is not free to leave and fits the definition of custody traditionally applied under Fourth Amendment jurisprudence. The District Court in determining that the defendants were not on notice of any observable medical needs of Mr. Perry unfortunately took the side of all of the factual inferences of the defendants rather than the plaintiffs. Let me ask you, is there a transcript of the 911 call placed by the county? I do not know if there is, Your Honor. I'm just interested in what might have been said during that call. In another matter in your complaint, you have claims under the Eighth and Fourteenth Amendment, and yet you changed the basis of the claim to the Fourth Amendment. Yes, Your Honor. I think the Fourth Amendment is the proper analysis to apply, and the District Court did apply that properly. And under the Fourth Amendment standard, it doesn't have to rise to a certain level of seriousness as it would be the case under the Eighth Amendment, though we would suggest that under either standard it would be applicable here, given when the facts are considered in light of the plaintiff and in favorable light to the plaintiff. Mr. Perry noted his seizure history when he was brought in, that he was on daily medication, that he had not received his daily medication that day. Then he actually has a seizure incident where he collapses and hits his head on the concrete floor. He's hospitalized. The defendants see him suffer repeated seizures while he's in the hospital. He's there multiple hours. When the hospital discharges him, they discharge him with specific instructions to look out for these potential areas of risk and that if that happens to bring him right back. Those included things like if any loss of bodily function was occurring, such as was he lacking the ability to walk or ambulate, the ability to talk, or did he have control of his bodily functions. After he left the hospital, and it wasn't long after he left, he started to struggle to walk, struggle to talk. He defecated in his own pants. He urinated on himself. He started to drool. He was starting to say, help me, and he had problems breathing. Unfortunately, the reaction of the defendants was not to review the discharge instruction and return him to the hospital. Instead, it was to put him in a compression hold, put a spit mask on his face, shackle him, isolate him, and tell him that if he acted like an animal, they were going to treat him like a prisoner. The effect of that... So there was, in your view, no evidence of resistance by him during the course of this, any interaction when he was in the custody of the city? No, Your Honor. They were interpreting his inability to function bodily as resistance, which it was not. If they had paid attention to some of the instructions and noticed that he wasn't defecating on himself as a matter of rebellion, he wasn't urinating on himself as a matter of rebellion, he wasn't falling down and collapsing and hitting his head as a matter of rebellion. He was doing this because he was losing bodily function, which was a side effect of his condition. Ultimately, the city defendants recognized the medical crisis, I believe, as one of the defendants put it, and took him over to the county. They brought him into the county prescreening room. Let me interrupt just a minute. Yes, Your Honor. What you've described so far is all with the city, right? That's correct, Your Honor. Okay, and then what happened before they took him to the hospital? Before they took him to the hospital, at the first prescreening, he told them that he had had a seizure history and that he had not been given his medication yet. They didn't do anything about that. Ultimately, he suffered a seizure while he was there in the jail, hit his head on the ground, and so they took him to the hospital at that point. Those were the events that happened before the hospital. Where he had two seizures at the hospital. That is correct, Your Honor. All right, go ahead. Once he was brought over to the county, when the county nurse looked at him, she saw he was in a spit mask. She saw blood on the outside of his spit mask. He was shackled. She didn't inquire into his state of mind. She didn't take off the spit mask. She didn't unshackle him. She saw his pants were falling down. She could smell that he had defecated on himself and urinated on himself. She saw him even fall off of the bench and nothing was done until the very last minute when he was already dead. Well, having looked at the videotape, she didn't touch him. She didn't try to get any of his vitals or anything. That is correct, Your Honor. There was no attempt. If she had attempted his vitals, if she had taken off the spit mask, if she had taken off the shackles and secured him, put an oxygen mask on him, any of those steps, he may be alive today. And that was in part the testimony of the plaintiff's expert, Dr. Walden. The defense urges their version of their expert. That's a jury question rather than a district court question. And then why don't you speak to this issue of whether he was in custody then when he was at the county? Because the nurse did. I mean, it's not like he came up to the door of the county. They looked at him and said, oh, he looks like he has a problem. Take him back to the hospital. He actually came in the door, way into the facility, correct? And two nurses looked at him. Absolutely. That's exactly right. And county people were around. That's correct, Your Honor. In fact, it appeared that the county people were holding him in custody. He was there for approximately 12 minutes before ultimately an ambulance was called for him. He was there in their booking room where people are routinely and regularly booked. If that is defined as not custody, every booking room in the country can now declare a person is no longer in their custody until they formally fill out a piece of paper that unilaterally declares that person in their custody. That's never been the Fourth Amendment standard. Clearly, he's not free to walk out and leave. Clearly, he's in their building, in their room, with their corrections officers, in their pre-booking facility with a person recognizing him, noticing him, and calling the ambulance, ultimately concerning him. In addition, we had a case here with the city. One of the city defendants recognized and thought that he was in county custody. They thought he was in both joint city and county custody. If we have a case where, by unilateral self-declaration, a defendant can declare themselves, say a person is not in their custody, it creates perverse finger-pointing defenses. Where the city can say, oh, he's not in our custody. He was in the county facility, county room, county booking place, etc. The county can say, well, we hadn't checked him in yet, so he's not in our custody. He's in a permanent purgatory where he's in effective custody, but nobody has any obligation to care for him, and he can die on the floor. That's never been the law. Separately as to the question of the Wisconsin statutory claims and whether immunity would apply, there are two critical... Let me go, yeah, you are on immunity now. So, do you have any case law that clearly establishes that the county defendants owed him a constitutional duty, even though they rejected him from the facility for medical reasons? Yes, Your Honor. In the Yang decision... In your best case law. I know you mentioned Yang in your briefs, but go ahead. Yes, Your Honor. The Yang decision at 37 F. 3rd, 282, this circuit determined that if an officer had a realistic opportunity to prevent a constitutional harm to an individual, there was a duty to do so. So, even if the county, even if it was determined that there was no custody of the county, here the person, here the nurse, had the medical skill and capability to know the problem, see the problem, and had a duty to address the problem. And just took no steps to do so. Is there any evidence that the nurse inquired of any of the officers what his history was or what had occurred? No, Your Honor. She didn't ask the officers about has he had seizures, has he been to the hospital, what's happening. She had just heard that they thought he was a difficult person, but she made no further inquiry into that. It appeared she acted on an assumption rather than making further investigation based on the facts staring right at her. As to one final aspect as to qualified immunity, the defendants seem to suggest that unless a very specific fact pattern has happened before that the qualified immunity applies. As the U.S. Supreme Court determined in Anderson, this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. A decision that was issued in 1987, 483 U.S. 635. The duty to provide care has been well established by the Supreme Court from Farmer on forward and by this court from Benjamin and Davis and Ortiz all the way through. As to the state law claims of immunity, there are two different aspects. The immunity extends to policy making decisions, that to truly discretionary decisions. There's no discretionary duty about whether to give medical care to a person in their care or custody. In fact, medical care itself is exempted as the kind of discretion that's not meant to be applied for state immunity. That is determined in the Scarpacci decision at 292 Northwest 2nd, 816 by the Wisconsin Supreme Court. And later the Lodal decision reinforced that where it said the negligent performance of a non-discretionary duty does not have immunity attached to it. This was not a case where the police officers were making policy decisions about how to train officers or anything of that nature. This was a case in which the duty was to provide needed medical care that was observable at the time. That is not something to which immunity applies under Wisconsin state law. Finally, as to the city defendants claim that there is no customer policy at issue, there are two policies in particular at issue here. The city had been training people that if a person was talking, they were breathing. That gave them a misinstruction that a person couldn't have a breathing problem if they were able to verbalize a single thought. That has never been the case and in fact is a very dangerous and precarious method of training people who have people in their care in custody. The second customer policy, which has been recently rectified but was not present at the time, was to have a review panel or some manner of disciplinary process in place so that when an officer made a mistake like all the officers here did, that there was some corrective disciplinary action taken. Unfortunately, no corrective disciplinary action had happened in the more than a dozen deaths in Milwaukee care and custody since 2000 until this suit was brought and later a review panel was imposed. Based on that, I will reserve the remainder of my time. Thank you. Okay, thank you, Mr. Barnes. Mr. Cade? Thank you, Your Honor. I'll be brief. I'm here to address the issue with regards to sanctions that were assessed under 1927. Two main issues that I'd like for the court to consider. First, sanctions under 1927 are permitted only if a court determines first there is no legal or factual basis. The only thing the district court determined was that the counsel below should have known that he was not in the custody of the county. They should have known that. And the reason they should have known that as of April of 2013 is because of two depositions of county employees, Inspector Schmidt and Nurse Vergo, who both said, well, he wasn't in our custody. And if that's the standard where a defendant or an employee of a defendant can simply say no, where you have the city of Milwaukee and the chief of police pointing the finger saying he's in joint custody, then you're always going to allow an opportunity for sanctions to occur. But what about the county defendants who had no interaction with Perry on the night he died? In terms of the sanctions, Your Honor? Yes. Well, again. They had no, they had no, okay, so put aside the, you know, whose custody is he in. But there were certain county defendants identified that had no contact with him at all. Right? Well, everybody was involved in terms of contact physically touching him. That is correct. Well, any interaction with him that night? Well, for example, the sheriff, that is correct. But, again, Judge Williams, what you have is you're doing discovery. What they said, what Judge Randa said is you should have known as soon as you deposed Virgo and Schmidt that the county, not these individual defendants, that the county should not have been involved. And that's an entirely different situation where you have the city saying, well, he's in both of our custody. With regards to whether it's a tactical decision to leave the sheriff in or not, there are other methods to alleviate or have that defendant reduced. You write a letter saying, hey, if you don't do it, I'm going to file a Rule 11 motion. That was an opportunity. The other problem with the 1927 sanctions, besides the fact that there is a factual dispute as to custody, was the fact there was no hearing. Judge Randa sua sponte said, I'm going to sanction you under 1927. The problem, Judge Williams, is that was the second time he had done it. In January of 2013, he sua sponte sanctioned Attorney James Gindy because the city asked for the file of the expert witness. And Attorney Gindy said, Rule 34, I get 30 days. So the city turns around, moves to have the file produced in less than 30 days. The motion is granted. And then Judge Randa turns around and sua sponte sanctions him. No opportunity to be heard. No hearing. Nothing. Just said, I'm going to do that. That is not what the case law is in this district. You are allowed an opportunity to be heard. Maybe there is a factual reason. Maybe there is a legal justification. But simply saying, I'm going to sanction you, has never been the standard in this district or in any other district under 1927. Thank you. Thank you, Mr. Cade. Ms. Lappin. Good morning. In this matter, Mr. Perry was a prisoner of the Milwaukee Police Department. It's not disputed that Milwaukee Police Department officers are trained that they are to provide first responder attention to any subject, any prisoner, any citizen, if when in their presence this person would evidence behaviors which would indicate that they are in an emergent or emergency medical situation. Officers receive that first responder training as a normal part of their training. Also, officers who are assigned to the city of Milwaukee jail facility receive an advanced course relative to working in that facility. It's a temporary restraining or holding facility, and they receive training relative to how to monitor prisoners, how to attend to their needs, including their medical needs, and how to keep an eye on them should any situation occur while they are contained within that temporary facility. It's not in dispute in this case that all the officers Well, they sure screwed up here. Well, in this particular case, there was no emergency medical situation that occurred Well, that's ridiculous. after Mr. Perry was released from the hospital. He had a seizure. Per protocol, officers who were attending to him at that time called for an EMT after they provided first responder response. They got him comfortable. They got him stabilized. He was having a seizure. EMT representatives, I think it was from the fire department, came and responded. They then brought Mr. Perry to the hospital. What is this spit bag doing on his face? That was put on him later. So after he had the initial seizure Well, that's not an answer to my question. While we were discussing what was occurring Why was it put on? Why was that put on his face? After he came back from treatment at the hospital, Mr. Perry was drooling and spitting and emitting fluids from his mouth. Well, it makes it worse, of course, for him if he has a mask over. Then he can't get rid of any of that stuff. With regard to the Do you understand? Barrier, yes. Do you understand? That is keeping all his fluids in his face. I respectfully disagree. Oh, come on. The mask is made of paper. Don't be ridiculous. It's made of a paper towel. How would you like to have that on your face? I put it on my face. If you were choking. I put it on. You were choking? I was not choking. Yeah, but if you are choking and you have this on your face, you're in much worse condition than if you can spit it out. There is no evidence that Mr. Perry was choking. The mask is a very loose-fitting device. It's made of a paper towel-like material and a mesh. The barrier that's in front of the mouth is that paper towel-like material. It sits very loosely on the head, over the shoulders. But don't you understand, if you block his mouth and he's got these terrible fluids coming out of his throat and so on, you make him much worse off. The barrier did not block his mouth. He was spitting and drooling. What do you mean? This mask doesn't block his mouth? It keeps what's being expelled from the mouth from hitting other people. The barrier fits very loosely. There is space of inches between where that barrier, that paper towel-like barrier fits and the mouth itself. He would still be able to spit out anything, cough anything. The point of having that paper towel-like material is to keep those fluids from striking other people that are nearby. Striking other people? What, the police are afraid of being spat on? There is a concern relative to the biohazard that's created by that type of expulsion. So let's even get before the spit mask happens. So they take him to the hospital. He gets to the police station. He's shackled on the floor. Correct. I mean, they're informed that he had seizures at the hospital. And then he's in the hallway. He can't even, when he's shackled to the floor, he can't even sit on the bench. And then he's in the hallway. He urinates and defecates on himself. And he yells out he can't breathe. Isn't that a medical emergency? And one of the officers, at least according to one that says, if you're talking, you're breathing. And there's no medical care that was provided. And that was when he was put in the compression hole. And that's when he was given the spit mask. And one of the officers said if he was going to act like an animal, he would be treated like he was in prison. And then he was, even with all of that, he's placed in the cell with 15-minute checks. And he's in there, and he's moaning and groaning and rolling around on the floor, and nobody thinks there's a medical emergency. He had just been released from the hospital. I understand that, but people get released from the hospital all the time, and then they have a relapse or they have some other. You still have to look at them carefully. The nurses told them to be on the alert. They knew he was having these seizures and everything. And so this behavior suggests to me that he should have been returned to the hospital. The two officers that accompanied him to the hospital, Officer Jackson and Officer Cruz, were present when he had those two additional seizures at the hospital. They observed him receiving two additional doses of Dilantin, or an equivalent anti-seizure medication. They remained at the hospital for at least an hour and a half after the last of the medication was received by him through IV. He had changed from when he came into the hospital to this point in time. When he came into the hospital with these officers, they observed that he was interacting. Oh, I get all that. I get all that. They do fine. I'm talking about, okay, so he gets released to come back to the jail. They've seen all of that. And at that point, when he's released from the hospital, he is not able to ambulate. He is not responsive to their questions as well as he was prior to those two seizures that occurred. In fact, one officer, Officer Cruz, had been an EMT prior to coming with the Milwaukee Police Department. They questioned whether he was ready to be released with the nurses. The nurses responded that he is fine. What this is is the effects of the medication. There will be sleepiness, drowsiness. There will be lethargy. He is under the influence of medication, and he's fine to be released. They had to wheel him to the squad car because of his lack of being able to ambulate. With those two officers, Mr. Perry's condition did not change from the point in time when he left the hospital to the point in time that they placed him into the solitary cell when he was at the PPS. From their perspective, and it's just— Except he defecates on himself. He urinates on himself. He says he can't breathe. This is all before they put him in the cell again. There was an odor of urine. There was an odor of feces. That is not something that's unusual or uncommon for a prisoner who's brought into the prisoner processing section or that officers deal with in that jail facility. But this is a person coming from a hospital. It's not an ordinary arrest. Correct, but it's also somebody who's under the influence of a medication. You know, I'm going to say, I don't think I've ever seen such bad police behavior in my 35 years as a judge. With this particular manner, the officers— The crudeness of their comments. That comment was made by one lieutenant, and he testified that he made that comment as a shocking device to make Mr. Perry be more cooperative with the officers. Really? He was processed at that jail. It's just unpardonable. Well, Your Honor, there was no information before those officers which indicated that he was experiencing a medical situation, that it was an emergency that required them to call an ambulance or provide any additional medical care for an emergency responder physician. But as Judge Williams was saying, you're in a hospital, you have a serious problem, you're released from the hospital. It's not at all unusual for the release to have been premature, and you come home or something, and you're violently ill, and you have to be taken back to the hospital, not stuck into a cell. The officers did not observe anything which indicated to them that there was a change in that condition. He was consistent from the condition he was in after receiving that medication. He was placed in a cell. He was monitored continually. The monitoring form indicates that he was checked on several times. If you have to monitor him, he should be in a hospital, not in a cell, being monitored by cops. But like any other prisoner, he was monitored. He's not like any other prisoner. That's what your clients did not understand. And, Your Honor, they may... Just like any other prisoner. Any other prisoner just came from a hospital? As far as him being monitored, all prisoners are monitored while they're in the cell. When they went to retrieve him... But the police are not medical. If a prisoner has a medical emergency, and he's just been in a hospital, and he's had serious problems, you send him back to the hospital. Correct, but no officer... Why on earth was he not sent back to the hospital? No officer recognized that there was any additional medical emergency that occurred. Oh, then they're really beyond stupid, because you said they're supposed to be trained to observe medical problems. Correct, and with their training, things like having a seizure, having a heart attack... Any kind of allergic reaction would indicate to them that there is something additional here to call for the EMTs to bring him back. Well, see, it's 645, they bring him back to the police station. He's put in this cell. After all the things I've gone over, I'm not going over that again, but he's moaning and groaning and rolling around on the floor. He goes into the cell at 820, and there's also blood and feces and urine on the floor of the cell, and there's blood on the spit mask, and they don't take him back to the hospital. They take him to county, right? They took him to the CJF facility, and even when he was at that facility and being triaged, the trained nurse did not feel that he was... So tell me, what did the triage consist of? Because on the video, the nurse gets about maybe a foot from him. She doesn't touch him. She's not using any kind of medical equipment. He's not in a position to really answer. So what is triage? Tell me, what was the triage? I'm unfamiliar with her trading is with regard to triage. No, but have you seen the video? Have you seen the video? I have. And you've seen her be about as far as I am from the mic, and she kind of leans down, doesn't touch him, doesn't test him, doesn't do anything, doesn't ask the officers what's the deal, what kind of situation is he in, right? She talked to him. He responded to her. She made the determination she was going to wipe his face. The mask was removed. And during that whole interaction, she, a trained nurse, did not reach the conclusion that he was experiencing an emergency medical situation. It was only until after he lost consciousness that she made that determination. And she's a trained nurse. But she didn't know any of his history, right? Because she didn't bother to get the history from anybody. What she heard was, you know, he's problematic. But do you have any evidence that she said to the officers who brought him in, what's the deal, what's happened with this guy, what's going on? No. And he had just been brought into the facility. He was only there for a few moments. His paperwork from the hospital had come with him. And, no, I don't believe she had an opportunity yet to review that paperwork. To review the paperwork or ask any questions. She did not ask any questions of anybody. My understanding is she spoke with Mr. Perry, and she asked him questions. And he did respond to her by confirming his name at one point during that initial interaction. And it says she assesses him, and she says he could only nod in his responses. And she didn't remove the spit mask to ask if he was having any trouble breathing. And then Virgo refuses to book him and says he's not medically clear. That was a few minutes later. Correct. Correct. At the time they got to county, was Officer Jackson the other one? What's the name of the other officer? Officer Cruz? No. Was Cruz the EMT? Correct. And Officer Jackson, Officer Cruz accompanied Mr. Perry from his time in the hospital, his transport to the PPS, and then as he was being brought into the cell, the solitary cell temporarily before he was transferred to the CJF. So they were present up until the time he was placed in that cell. Okay. What I'm trying to do is this transition point. Right. Yes. When it's transferred to the county. Yes. What did Cruz and or Jax tell the person who was receiving them in the county at that encounter? They were not present when he was brought over to the county. Different officers transported him to the county, but within his information was the paperwork from the hospital. Did anybody from the city tell them about his seizures or medication or anything like that? No. That was in the paperwork, and I believe that Mr. Perry. Well, that's something they had to read. Correct. But I believe that, and the video shows this, as he was coming through the doors into the facility, Mr. Perry's knees began to buckle, and then he was brought immediately over to the nurse's station. That's when it looks like they're kind of dragging him. Correct. Right. Correct. And so I think things were happening so rapidly at that point in time that they did not grab the paperwork to bring it to the nurse. By then the nurses were attending to him, and the officers then didn't defer to the nurses. But the point is, when she's attending to him and no one says anything to her about his prior history or what had happened, no one, the city defendants don't say it. I understand it's not the two that brought him in originally. Correct. Correct. But the two that then brought him in didn't give any history or anything. I don't believe so. They did have the paperwork from the hospital. But keep in mind, when those two officers went to the jail to get Mr. Perry to take him to the county, he was standing, he was ambulating on his own, he had removed the spit mask, and they were walking alongside him. But he was walking to the elevator, then he was walking from the elevator to the conveyance vehicle. His knees buckled as he was coming through the doors to the Sallyport area. So from the officer's perspective, there was nothing about him which indicated that he was having any kind of medical difficulties. Through all of his history, whatever we want to call that, from the time the city had custody of him and then turning over to the county, they did not relay to whoever it was they handed him over to the fact of all this. It's all on paper. From leaving the city or the city jail to transport to the CJF, yes, because that happened about an hour and 15 minutes later. The transfer was not this guy's had seizures, he's been to the hospital, etc. None of that was said. It's all on paper. Correct. His hospital records were with him. And that's when somebody goes and looks at it. Correct. And it's part of the admission process. But because of his knees buckling, I believe that he physically was showing signs of deterioration, and that received the attention. So I don't believe that. So when his knees buckled, what did the cops do? They brought him to the nurse's station, and the nurses then began to look at Mr. Perry. They brought him where? To the nurse's station. So this is in the jail? Correct. It's in the ground floor. It's the Sallyport area. And so the vehicles park outside and come through these flapping doors, for lack of a better term. And then immediately inside, there's a nurse's station. And the nurse said what about the buckling knees? She attended to him. What do you mean, attended to him? To Mr. Perry. I know. What does it mean, attended to him? He's just been in the hospital, now his knees are buckling. So what does the nurse do? I believe she initially talks to him. He nods to her. She asks him his name. You're talking about the county. Correct. You're the city, right? I'm the city. But I believe from the videotape, that's what was shown, and from her deposition testimony. That's Virgo, what's her name? Yes, there is Nurse Virgo and Nurse Wenzel. And so there were a couple of medical caregivers that were there. The officer, after he began to buckle, brought him over to their location and deferred, essentially, to the nurses taking care of him from that point forward. Well, the thing that bothers me, since everybody else has kind of expressed themselves, what bothers me is that that encounter, somebody from the city didn't give some verbal detail about why this guy's knees are buckling, et cetera, that he's had seizures, he's been to the hospital, et cetera. So instead of saying, this guy needs an ambulance right now, they just gave her the paperwork. And then they go see kind of a routine intake, and there seems to be one after another has some sort of an encounter, briefly or whatever, until somebody realizes this guy's in trouble. And, frankly, he's dying. He died of a heart attack, we ultimately know. Correct, which was something that was unforeseeable to the officers. Well, it's unforeseeable, but I'm not sure what they would have done at that point. That's why I'm asking about the city. Correct. Did the city fulfill all of its obligations, and not from hour one? Because that's where I see the vulnerability here. I believe the city employees did, Your Honor. The officers, again, the two officers who were responsible for the transport were Officer Silinski and Officer Lopez. They did not observe anything from the time that they retrieved Mr. Perry from the jail cell until Where is Jackson Cruz? Gone to another assignment. In other words, they handed him over to two other city people, and the two other city people who didn't know all his background delivered him. Well, actually, he was put into the jail cell. They gave the information, including the hospital paperwork, to Officer Dias-Berg, who served the role as the jail matron, or one who was responsible for making cell checks and so forth, and also Lieutenant Robbins. And so they had that information. Those individuals did know that Mr. Perry had come from the hospital and that he had the hospital paperwork. But from the point in time that he had come from the hospital and had been placed in the cell, there was no observation of any seizure activity. In fact, he appeared to improve. The effects of the Dilantin appeared to be wearing off because he could ambulate himself. He was standing, he was walking, he had taken the spit mask off. There was testimony even from a jail janitor, Mr. Pichner, who said that when he was in the hallway, Mr. Perry had actually stopped him and asked him what time it was, or something about the time. So he appeared to be behaving as any other prisoner would, not evidencing anything. Oh, he's all better, you mean? Well, he had gotten the medication, he was released from the hospital, and there was nothing about him that indicated that he was, at that point in time, in a medically emergent or emergency situation. What do you think of this phrase, if you're talking, you're breathing? That particular phrase, my understanding, it's something that when officers get the American Heart Association first responder training, they're given a CPR training, and that's an adage that's used by trainers when doing the evaluation of the ABCs, so you talk about airway, breathing, and so forth, and one adage that's used in the context of training that officers recalled hearing was something to the effect that if you're talking, you're breathing, meaning if you're talking, you're passing air through your vocal cords. No, come on, but that isn't true. You can have serious breathing problems, but also be able to do some talking. But the context of that statement... They shouldn't talk that way. But there was a... It's so crude. But in the context in the video, when you hear the officer saying that... And what about this, if you're behaving like an animal, we'll treat you like an animal? What's that come from? That, as I said, was Lieutenant Robbins talking about a colleague... He thinks it's all fabricated? No, he admitted to making the statement, and then, in fact, he received a demotion to sergeant for making that disrespectful statement. He what? He was demoted to sergeant for making that disrespectful statement. But the thing is, even before he makes the statement, he gets released. He's at the police department. He's shackled. He can't sit at the booking area, and he's in the hallway, and he urinates and defecates on himself. Shouldn't that be a sign, given what has happened? And he yells out he can't breathe. Then he gets the spit mask, and then he's still put in a cell, and he's groaning and rolling around all the time he's in a cell. There are no inquiries made about whether there's some medical issue, at least on the record. There's no evidence of what anyone said to him or what these checks revealed every 15 minutes, other than him groaning and rolling and moaning around on the floor. And also there's evidence indicating that Mr. Pichner had a conversation with him about the time that when Officer Selensky and Lopez... When he's rolling around on the floor or when he's waiting to go in the cell. Mr. Pichner testified that he was standing up in his cell, had removed his spit mask, and was asking Mr. Pichner about the time. Okay. And also... But were there actually checks done every 15 minutes, and were the observations during the checks that he was moaning and groaning, do you have any testimony of the officers about what they saw in these 15-minute checks? Officer Diasburg testified that when she checked on him, he did not appear to be in any type of physical distress. Was he moaning and groaning and rolling on the floor when she saw him? He appeared to be acting consistently with how he acted when he came into the jail facility. Which was what? That he was seated on the floor, that he appeared to be somewhat resistive, that he was drooling and spitting. She knew that he had received medication from the hospital. And so she interpreted the drooling as being resistant? Well, there was other testimony relative to physical muscle resistance and tension and not responding to the officer's directions. But he's in the cell now. No officers are there. I'm asking you about what she saw about him in the cell. Was he on the floor moaning and groaning and drooling? I'm not sure about the drooling. I think her testimony was he was moaning and groaning, that when she made her various checks of his cell that he... What's so grotesque about it is you'd think that the police would want to get rid of this guy. Get him back in the hospital. You don't want a prisoner throwing up and this and that and the other thing. It's just so stupid police behavior. He had just been released from the hospital. It's so pointless. He's been released, but he's obviously very ill. But the officers are told that he's under the influence of medication. Ms. Dias-Berg knew that. Doesn't matter what he's under the influence of. He's obviously in very bad shape. But according to the hospital personnel who released him and cleared him from the hospital, he was under the influence of the medication, and Officer Dias-Berg was aware of that when she did her checks. That's ridiculous. From her perspective... No common sense is being employed, was employed by this. It's the common sense of the officer being told by hospital personnel... No, you have a sick person in the prison, you send them in the jail, you send them to the hospital. You don't want a sick person in a jail infecting other inmates. It doesn't make sense. They were not told that he was sick. It doesn't make sense. But they were not told that he was sick. They were told that he was under the influence of anti-seizure medication, which would make him lethargic and sleepy. Okay, but in the jail he wasn't lethargic and sleeping. He was rolling around, moaning and groaning and spinning up. That's not lethargic. That's not sleepy. Right? Officer Dias-Berg did not... You give me that, you can answer that question. Well, she did not testify that he was spitting up. She testified that she heard him grunting and making noises and that he was on the floor and had been rolling. She had observed that he had taken his spit mask off. So usually lethargic means the person is just slumped over, just not doing anything. Correct. Lethargic, at least that's how I would view it. But he's doing more than that. But from her perspective, this was not inconsistent with the behavior she observed when he first came back from the hospital. And she understood that his behaviors were such because they were affected by the medication he received at the hospital. There was nothing that alarmed her compared to what she had seen earlier to give her any indication that this was a change in condition, that this was something significant that was going on. He was moaning and groaning in the hospital too? Is that the idea? When he left the hospital... He's a moaner, groaner, so... When he left the hospital, he was not as responsive to the officers as he had been when he first came in the hospital, as far as the communication, the verbal communication. You guys were soft. They had to... Yes, they had to wheel him to the squad car. They brought the concerns to the hospital personnel. Okay, that's enough. Thank you. So, Mr. Ball? Good morning, Your Honors. With regard to Milwaukee County, it is important to note that there is no Monell putting before the court. There is no pattern and practice claim before the court. The only issues before the court involve individual capacity claims against Milwaukee County employees. There is an individual capacity claim against Officer Douglas, whose only factual involvement in this case was that he heard a medical emergency had been declared. He picked up a resuscitation bag with medical equipment. He took it into the pre-booking room. He gave it to the nurse, and he walked out. He was there for 23 seconds. There is an individual capacity claim. His name is what? Douglas. Douglas. Could you go... I'm interested in the point of transfer. Who from the county first encountered Mr. Perry? Your Honor, in my notes, I don't have that, but Mr. Perry came to the pre-booking room. This is not the booking room. The pre-booking room at 842. At 843, one minute later, Sergeant Hale came into the pre-booking room. Okay. Who brought him in? The city brought him into the pre-booking room then? Of course. He was in the custody of the city. That's what I'm trying to figure out, the transition. They've gone over a lot of problems with the city. I'm trying to figure out now, what did the county know at the initial encounter? The county knew only that there was a prisoner en route who had been described as being combative. That's all. Who had been what? I'm sorry. Excuse me. Who had been what? Described as being combative. Combative. Combative. That's somebody's term who was delivering him. That's a term the city officers used to describe the prisoner in their custody. All right. You can proceed through the process of each encounter, I guess. There is an individual capacity claim against Officer Jeff, J-E-F-F. No, no, no. Give us the facts. So he gets to the county. That's what Judge Mannion is asking for. Okay. What are the facts? He gets to the facility. It looks, when you see him, that he's being dragged into the facility. There are a couple of county officers that are there, correct? There are county officers in the pre-booking. Right. That see him. Yes. Right. Okay. They see him. He's taken to the bench across from the nursing station because he can't walk on his own. And at this time, he's now soiled his pants. His soiled pants are around his ankles and have slid to the floor. And he can't sit up, right? That's exactly right, Your Honor. What is significant is that he arrived at 842. Sergeant Hale came into the room at 843. At 843, he was moved to the bench. At 844, Nurse Virgo enters the room. At 845, Nurse Wenzel enters the room. And at 846, Nurse Virgo tells Sergeant Hale they will not accept this prisoner. A call at ambulance. Within four minutes of Mr. Perry arriving at the pre-booking room in the custody of the city, a nurse made the decision not to accept him and instead to call an ambulance. An ambulance was called at 848. The ambulance arrived at 855. From beginning to end, only 13 minutes went by, and the decision to call the ambulance was made in four minutes. It was not made at 852? No. At 852, an emergency was declared by the nurse. At 852, that's when Officer Douglas brings the resuscitation bag and Officer Jeff brings in the defibrillator. There is also an individual capacity claim against Officer Holmes. Officer Holmes was in the glass control tower under strict orders not to leave because he controlled the doors to the outside world. His orders were don't leave the control tower, and he didn't leave the control tower. There is an individual capacity claim, as I've said, against Nurse Virgo who called for an ambulance four minutes after Mr. Perry arrived and two minutes after she entered the room. There is an individual capacity. Well, Virgo comes. She's about a foot away from him. We can't see on the videotape what the conversation was. She leaves, right? She leaves to tell Sergeant Hale to call an ambulance. No, she leaves to—doesn't she go to find Wenzel? Because she doesn't—Virgo leaves, though, at some point. She approaches him. She's there for a few seconds. She doesn't take any vitals or anything. She goes back behind whatever that little barrier thing is, that little wall is, and then we see Wenzel come out because Wenzel's the one who doesn't take the vitals and decides that he needs to be watched for a bit, and then the ambulance is called. I think that's correct. And when you watch the video, it looks like these things are happening in slow motion. But when you look at the clock, the empirical fact is Nurse Wenzel entered the room at 8.45, and at 8.46, Nurse Virgo tells Sergeant Hale to call an ambulance. Sergeant Hale arranges for the ambulance to be called at 8.48. That is extremely prompt medical care. It cannot be said that anybody was deliberately indifferent to Mr. Perry's rights. All the county knew was that they had a prisoner who looked incapacitated who had been described as being combative. Now, as I began, these are individual capacity claims for which qualified immunity applies. In the 2015 term, as your honors well know, the U.S. Supreme Court clarified the defense of qualified immunity in the Taylor case, the Miller case, and the Sheehan case, and this court has acknowledged those clarifications in the Zierman case and the Werner case. So let me ask you this, because this isn't really an Eighth Amendment claim. This is a Fourth Amendment claim. So isn't the question whether a reasonable person in Perry's position would have felt free to leave the county facility? It is absolutely true that Perry should not have felt that he was free to leave. He wasn't free to leave, but he wasn't free to leave because he was in the custody of the city. Why do you say that? When he was in the county jail, he was in the custody of the county. He was never in the county jail. I don't understand that. He's being held in a county jail. No, your honor. Not for very long, but there he is. As a matter of fact, your honor, that is empirically false. Pardon? That's not true. What's not true? He wasn't there? He was taken to the pre-booking room where prisoners are cleared to go into the booking room within four minutes of his arrival. What do you mean? He couldn't leave. He couldn't leave because he was in custody. Yeah, but because he's in custody. He is in custody. He's in custody of the county. No. Because he's in a county facility where he can't leave. The county made an express decision not to seize him. Oh, come on. So is it your position you can't have two entities in joint custody over somebody? I assume you can. It was a county person who let him in. It was the nurse who came out, and when she first came out, she didn't take his vitals or anything, right? She didn't take his vitals or anything. In two minutes. No. When she comes out and does that first assessment, when you say he's nodding, she's not taking his temperature. She's not doing any of his vitals, right? That's right. Yeah, but to get back to the question, are you saying you can never have joint custody? I mean, he was in a county facility. The city was there as well. So he's in the custody of the county. I understand he's not formally in custody. He hasn't been processed. But who's got the duty? Once he walks through that door, it's the county. The county has some responsibility. Well, to answer the last part of your question first, the county arranged for an ambulance to come within four minutes. The first part of your question is, can there be joint custody? I assume there can be joint custody. There can. C-A-N. There can be. Yes. But that is not this case. Mr. Perry was... That's the most absurd technicality. He's in a jail. He can't leave. The jail is run by the county. He's in their custody. He is in the pre-booking room. Honestly, this is... Why don't you stick with where you were going with each individual, how much time they spent, from the beginning to the end of the county's, well, I'll call them encounters. I'm going to call it custody. Well, Your Honor... Obviously, he died on site. Yes. So we have this time period. Yes. And that's why I keep asking about when the city released him or relinquished him or whatever you want to call it, what did the county people then do? And that, to me at least, is important to what extent the county is liable. At 846, Nurse Virgo tells Sergeant Hale to call an ambulance. At 848, Hale makes arrangements for an ambulance to be called. Now, they complained that two minutes took too long. Apparently, that is the appellant's theory. All right. Well, that's two minutes instead of, I don't know, one minute or something. At 849, Sergeant Hale returns to the booking room after having made arrangements to call the ambulance at 848. At 852, it is obvious, you can see it on the tape, that Mr. Perry's condition worsens, and they call a medical emergency. Yes. Well, you know, this is summary judgment, so I understand your position that they were acting very promptly. But the problem I have is someone else could take a different view. The jury could take a different view. When they see that he was left alone on the floor rolling around, none of the nurses really rendered any aid or took his vitals, why couldn't they look at that and determine that the nurses' actions were not reasonable under the Fourth Amendment analysis? Because the first time the vitals were taken was after the spit mask was taken off and he was not breathing. So, I mean, I understand your position. This was rapid fire. We treated him very quickly. But the jury might look at that differently. Your Honor, since 2015, the law of qualified immunity is that the plaintiff has the burden of showing that every reasonable officer would know beyond debate that the officer was violating somebody's constitutional rights. And the Supreme Court has... Well, if Virgo was as unattentive as your opponent contends, why wouldn't that be deliberate indifference? Virgo called an ambulance... She said, according to... Maybe they're wrong. But they say she walked... This is Virgo. She walked away from a clearly distressed man in the final minutes of his life to confer with an on-call doctor about rejecting Perry and then started doing paperwork. That is simply incorrect. At 8.46, Virgo walked away. She walked away to make arrangements to call an ambulance. Later, after the ambulance had been called, there was a time when the ambulance is en route, Nurse Virgo walked away again to call Dr. Grebner, who is the medical director of the jail. That is a perfect... Both of these things, on her part, were perfectly reasonable. Was your call to the doctor to have him get over there or to tell her something over the phone, what she should do? Nurse Virgo did not summon the doctor. She gave him the information that this had happened in the pre-booking room. That's just for the record, then, I suppose. The ambulance is on the way. Tell them what's going on. I guess that's her superior or somebody she's supposed to report to. That's exactly right. Your Honor, I also... So, these two nurses, Virgo and Wenzel, they didn't try to provide any treatment or anything or diagnosis? Judge, they called an ambulance. But they're nurses. Couldn't they do something before the ambulance arrives? I can't address that question. You can't what? I can't address that question. You can't address it? Why not? I'm not a nurse. They have... Oh, come on. That's the stupidest thing... I've heard a lot of stupid things today. You're not a nurse. I can't imagine... You're supposed to know about the... all of the people who are involved in the case, what they can do. You're supposed to know what they can do. You're not supposed to just say, Oh, I'm not a nurse. I don't know anything. In the two minutes available to Nurse Virgo, I can't imagine anything she could have done that would have had any effect on the outcome of this case. Who removed the mask and saw the eyes roll back? Nurse Virgo, I believe. He's dead. That's a reasonable inference. Right, but she didn't do it when she first saw him. She didn't remove it, though. Right? That's true. Right. So she sees... So my understanding is he nodded his responses to her. She didn't remove the spit mask. She didn't ask him if he was having any trouble breathing. Right? When she first saw him. That's true, but not complete. She asked him who he was, and he nodded. Then she asked him a question that would have required him to verbalize, and he didn't. And then she concluded... And he didn't. And she didn't ask him if he was having any trouble breathing. No. She walked away to get an ambulance. Okay. Now, did he receive medical attention in the ambulance? What was the ambulance crew? He was declared dead. What? On the spot. He was declared dead on the floor of the pre-booking room. Right. Oh, before the ambulance arrived? Yes. He was dead. The ambulance arrived at 855. I don't think we can determine from the record exactly... Well, they did some more work on him instead. It could revive him. The spit mask was removed at 851. His head and his eyes rolled back. He was no longer breathing. Vomiting blood was on his face and left ear. That's when they tried to revive him. That's 851. 852, medical emergency is called, and CPR begins. Who does the CPR? You can see it on the video. I believe it's one of the nurses. To complete the timeline, at 853, Officer Douglas brings the resuscitation bag, and at 853, Officer Jeff brings the portable defibrillator. Right, and so all of that equipment was available to the nurses because it was right there in the nurse's office, this equipment? It was in another location in the jail. It was not in the pre-booking room. But clearly it was accessible pretty quickly. And the nurses did not ask for such equipment when they first saw him, correct? Well, after an emergency was declared. No, no, no. I'm talking about when she first comes to assess him. This equipment was obviously available because it ultimately got there. But she did not ask for any of that when she did her initial question. That's absolutely true. We know that's true because the emergency was declared at 852, and the equipment arrived at 853. So that's what I'm saying. The equipment was readily available, quickly available. So had the nurse made a different assessment when she first saw him, that equipment could have come a minute later. It did not. Time matters in a situation like this. You agree with that? Absolutely. Minutes matter. That is absolutely true. So my point is this was a summary judgment matter, and so this is a question that should have been put before the jury and not determined by the court, particularly given now these additional circumstances in terms of what was available to her. Well, it's true that it's a summary judgment motion, but the plaintiff still has the burden, under recent qualified immunity law, of showing that every reasonable officer, when the facts are viewed at a granular level, every reasonable officer would have known beyond debate that the constitutional rights were being violated. That's the current state of qualified immunity law. It cannot be said that every reasonable officer in the pre-booking room for the county would have known beyond debate that the medical emergency shouldn't have been called at 852, but it should have been called, for example, at 846, six minutes earlier. But that doesn't cover the nurses. That argument doesn't cover the nurses and their potential liability. Well, of course it does. I don't see it. The nurse is a qualified medical person. If I buy your argument in terms of the county officials, it doesn't cover the nurses. The nurse is a county employee. I understand that, but she's supposed to have training, but the officers don't. I understand the officers, you know, they got her to the nurse, got him to the nurse, and so they kind of deferred to the medical judgment of the nurse. I'm just saying that doesn't get the nurses off the hook. The nurses are entitled to qualified immunity, and they call an ambulance within two minutes. Yes, I know. We've heard about the ambulance. Look, we're going to have to move on. We've allowed a lot of time for everybody. Thank you very much. Do you want another minute, Mr. Barnes? Briefly, as to the county first, the plaintiff's expert, Dr. Walden, testified as to all the different things the nurses could have done and should have done within the medical standard of care. That included checking the vitals, remove the spit mask, remove the shackles, stabilize his body, give him an oxygen mask. If any of those things had happened six minutes earlier, he may be alive today. That is why they still belong in the case, and the jury should make the determination as to the county nurse's liability. As to the issue of what kind of officers are being held liable, it's those that are competent. It's not those that have failed to meet up the standards. It's not the subjective interpretation of the individual officer. It's what would a competent, reasonable officer do. As to whether things changed between when he was in the hospital, when he was discharged, and afterwards, when he was discharged, he wasn't defecating on himself, he wasn't urinating on himself, he wasn't drooling, he wasn't falling down. He didn't have all of the problems that he quickly exhibited soon thereafter, which, to go to the court's concerns about a spit mask and other aspects, in the discharge statement that was given to the officers, they noted risks of a seizure included someone who wanted to be on the floor rather than standing up or not being able to ambulate, and in particular they expressed concern about to prevent certain injuries from occurring, promote drainage of oral secretions out of the mouth, and prevent choking, because such drooling is an indication of an oncoming seizure or other physical stress. It wasn't a sign of someone trying to be disruptive. This was a death that was avoidable with simply competent care. The case should be reinstated. Thank you, Your Honor. Just one point, Mr. Pond. Ms. Lappin said that the spit mask doesn't actually prevent you from spitting? The plaintiff's expert testimony was that the spit mask further inhibited his ability to properly breathe and to be able to get the excretions out. So that's just a dispute of fact for the jury to determine. That's a dispute of fact. Okay, thank you, Mr. Pond. Thank you, Your Honor. Mr. Cade, do you have anything further? I waive my time, Your Honor. Okay, well, thank you very much. Thank you to both sides. The case will be adjourned.